UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

───────────────────────────────

AARON TOMPKINS,

          Petitioner,

   -vs-                    **No. 11-CV-6023(MAT)**
                                **DECISION AND ORDER**


PATRICK GRIFFIN,

          Respondent.

───────────────────────────────

## I.   Introduction

Pro se petitioner Aaron Tompkins ("Tompkins" or "Petitioner") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on the basis that he is being detained in Respondent's custody in violation of his federal constitutional rights. Tompkins is incarcerated as the result of a judgment of conviction entered against him on September 19, 2003, following a jury trial in Monroe County Court of New York State (Connell, J.), on charges of second degree murder, burglary, and criminal possession of a weapon.

## II.  Factual Background and Procedural History

The convictions here at issue stem from two separate incidents that occurred in the City of Rochester on August 27, 2002, and September 1, 2002.  The August 27th incident resulted in charges of second degree (intentional) murder, third degree criminal possession of a weapon, and second degree criminal possession of a weapon. As a result of the second incident, Tompkins was charged

with first degree burglary (three counts), second degree criminal possession of a weapon, and third degree criminal possession of a weapon. New York law permitted joinder of the offenses for trial. A summary of the pertinent testimony follows.

**A.   The Trial**

**1.   The Portland Avenue Incident**

On August 26, 2002, Sammie Cappadonia ("Cappadonia"), a clerical supervisor in the radiology department at Rochester General Hospital ("RGH"), finished his shift at midnight and went to wait for the bus on Portland Avenue in front of the hospital. T.205.[1] Richard Cooper ("Cooper") and his girlfriend,[2] whom Cappadonia had seen in the emergency room that night, walked up to the bus top. T.206. Wanting to be alone, Cappadonia walked about fifteen to twenty feet from the bus stop and stood there listening to music on his headphones and watching for the bus. T.207-08. From time to time, he looked back in the direction of the bus stop. At one point, he saw a "pretty fit figure" whom he "assume[d]" was black, walking towards the bus stop. T.208. Cappadonia did not think anything of it until he heard a "popping noise" which he at first thought was firecrackers. T.208. When he turned around, he saw the man firing a gun at Cooper, who was lying on his back in

---

[1]
Citations to "T.___" refer to pages in the trial transcript.

[2]
Cooper's girlfriend, Ma'Shona Attenberry, did not testify for the prosecution.

the middle of the street with his hands up in the air. T.210. Eventually, Cappadonia said, the assailant was standing "almost on top of [Cooper]" and firing directly at Cooper's torso and head area. T.211. Cappadonia did not see what happened to Cooper's female companion. As he was running away, Cappadonia heard the woman and Cooper screaming. T.211.

The prosecution introduced Tompkins' statement to the police[3] in which he admitted shooting Cooper. Tompkins explained that on the day of the shooting, a person whom he knew as "PT"[4] showed up at a house on Bartlett Street and asked Tompkins to "hold him down" (i.e., back him up). PT explained that his "cousin . . . got his ass kicked by his girlfriend's boyfriend [Cooper]" and the cousin wanted to shoot Cooper. T.179. Tompkins, who did not know Cooper or PT's cousin, agreed and got into the car. Id. Both PT and Tompkins had guns. T.180. There were several other individuals in the car, whom Tompkins refused to identify.

Tompkins and his cohorts decided to try the hospital first, because PT's cousin said that he had bitten Cooper during the fight. T.180. When they arrived at RGH, they saw Cooper, who had a brace on his leg, standing outside of the emergency department. At

---

[3]

Tompkins was in custody after having been arrested on February 4, 2003, on unrelated drug charges. T.170-73.

[4]

According to the police reports submitted as part of the state court records in this case, the police were aware that "PT" was a man named Anthony Foster.

some point, Tompkins and his group concluded that Cooper had already left, and so they departed as well.

When they returned, they learned that Cooper had been discharged. Assuming that he was going to need to take the bus home, they decided to stake out the bus stop. T.181. Soon enough they saw Cooper and his girlfriend walk up to the bus stop. Tompkins assumed that PT was going to do the shooting, but PT told him to do it because he (PT) had to drive. T.181.

Tompkins did not protest but instead got out of the car, with orders to "make sure [you] leave him", meaning to gun Cooper down. T.181. Putting a bandanna over his face, Tompkins walked up to the bus shelter and started shooting at Cooper, who started to run. Tompkins continued shooting, and Cooper fell to the ground, screaming. T.181. Tompkins turned back around and fired about four more rounds into Cooper as he was lying on the ground. T.182.

Tompkins ran back to the car and got in; PT and his cousin were acting "real excited" like they had "won the Super Bowl." T.182. Tompkins told the police that he "never meant for the guy to die" but "just wanted to shoot him a few times to teach him a lesson." Id.

### 2.   The Sanders Street Incident

Jamnita Wilson ("Wilson") was at 61 Sanders Street playing cards when Tompkins and two other men broke into the house at about 12:30 a.m. on September 1, 2002. T.226. According to Wilson,

Tompkins was the first one through the door. He was carrying handgun and did not have anything covering his face. T.228-29. Tompkins ordered everyone to "get on the floor" and started walking towards the kitchen, after which, Wilson heard gunshots. T.229. Wilson hid underneath a table and did not move from that spot. T.230.

Kenneth Lindsay ("Lindsay"), who lived at 61 Sanders Street with his mother, was in the kitchen cooking some chicken when he heard a male voice say, "All you get down, get down." A young woman ran through the kitchen saying, "This is a robbery," and then ran out the back door. According to Lindsay, Tompkins entered the kitchen brandishing a handgun and said, "Drop your pants, get on the floor, and put your hands behind your head." Lindsay told Tompkins that he had "babies" (his niece and nephew) asleep in the bedroom, and told him to take whatever money he wanted. Tompkins replied, "Fuck the babies," and hit Lindsay with the gun. The two men wrestled for control of the gun and during the struggle, the gun discharged a few times.

Tompkins yelled to his accomplices that Lindsay was trying to take the gun away from him. One of them came to the doorway and fired a shot at Lindsay, who sustained a gunshot wound to his leg. T.231. Tompkins and his cohorts then fled the scene. Lindsay threw the gun at Tompkins' retreating form.

Shortly after the intruders had left, Tompkins attempted to get back inside the house–presumably to retrieve his gun–but the occupants refused to let him in. T.232. Ballistics testing linked the 9-mm Ruger gun left by Tompkins at 61 Sanders Street to bullet casings and a bullet fragment recovered from the Portland Avenue murder scene. T.258-61, 264-70, 275-84.

Tompkins confessed to the Sanders Street home-invasion during his interview with the police. Tompkins explained that he agreed to participate because he believe that the house on Sanders Street was a "gambling house" with a lot of money on premises; he expected a haul of about $5,000 from the robbery. T.189. Tompkins borrowed a gun, and he and his cohorts drove to 61 Sanders Street, arriving there at about 12:30 a.m. When one of his friends was too scared to approach the door, Tompkins volunteered to do it. T.190.

A black male came to the door, and Tompkins pushed his way inside, ordering everyone to get on the ground. A "fat guy" (Lindsay), who "kept telling [Tompkins] his kids were in the back", started walking toward the kitchen. T.190. Tompkins followed him, and Lindsay grabbed Tompkins' gun. The two men "tussled", the gun went off, and Tompkins "let the gun go." Id. Lindsay picked up the gun, and he and Tompkins' friends all began shooting at each other. Id.

When the shooting stopped, Tompkins went out the back door and his cohorts exited through the front door. They did not take

-6-

anything from the house, and there was "hardly any money" on the table. Realizing that he had left his gun at the apartment, Tompkins returned and tried to get in through the back door. T.191. However, when the occupants yelled that he "wasn't coming back in," Tompkins ran back to the getaway car. Id. The police showed Tompkins a white hat that had been found at the crime scene which Tompkins identified as his. Id. Tompkins told the police that he was certain that he was not the one who shot Lindsay.

Prior to jury deliberations, the trial court dismissed one of the first degree burglary charges. The jury, after deliberating for about two days, returned a verdict convicting Tompkins of the remaining charges in the indictment.

**B.   Sentencing and Post-Conviction Proceedings**

Tompkins was sentenced to concurrent terms of imprisonment, the longest of which was twenty-five years to life. His conviction was unanimously affirmed on direct appeal. People v. Tompkins, 66 A.D.3d 1373 (4th Dept. 2009), lv. denied, 15 N.Y.3d 758 (2010).

**C.   The Federal Habeas Petition**

Petitioner timely filed the instant federal habeas petition raising a number of claims of ineffective assistance of trial counsel. Respondent answered the petition, and Petitioner filed a reply. The matter is now fully submitted and ready for decision. For the reasons that follow, the request for a writ of habeas corpus is denied, and the petition is dismissed.

## III. General Legal Principles

A federal court may entertain a state prisoner's habeas corpus petition only to the extent that the petition alleges custody in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a).

For federal constitutional claims adjudicated on the merits by a state court, the deferential standard of review codified in the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") applies. A habeas petitioner can only obtain habeas corpus relief by showing that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2).

## V.   Analysis of the Petition

### A.   Ineffective Assistance of Trial Counsel

#### 1.   Overview

The Appellate Division denied Petitioner's challenges to defense counsel's performance, stating that "he was not denied effective assistance of counsel[.]" People v. Tompkins, 66 A.D.3d 1373, 885 N.Y.S.2d at 668 (citing, inter alia, People v. Baldi, 54 N.Y.2d 137, 147 (1981)). The Second Circuit has held that New York's "meaningful representation" standard, articulated in People

v. Baldi, supra, for evaluating counsel's performance is not "contrary to," 28 U.S.C. § 2254(d)(1), the principles set forth in Strickland v. Washington, 466 U.S. 668 (1984). Strickland has been deemed to be the "clearly established," 28 U.S.C. § 2254(d)(1), Supreme Court law for evaluating claims of ineffective assistance of trial counsel. Rosario v. Ercole, 601 F.3d 118, 126 (2d Cir. 2010) (citation omitted). Thus, Petitioner can only obtain relief if the Appellate Division's adjudication of his ineffectiveness claim was an "unreasonable application" of Strickland. Id. The Supreme Court has explained that, under 28 U.S.C. § 2254(d)(1), the "question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Harrington v. Richter, 537 U.S. __, 131 S. Ct. 770, 788 (2011).

### 2. Trial Counsel's Alleged Errors

#### a. Failure to Inquire Whether the Right to Counsel Had Attached at the Time of the Interrogation

Tompkins contends that trial counsel was ineffective in failing to ask whether his right to counsel had attached at the time he was interrogated by the police.[5] Respondent contends that this assertion is contradicted by appellate counsel's arguments on

---

[5]

Under New York state constitutional law, in contrast to federal constitutional law, "the indelible right to counsel attaches whenever an arrest warrant is issued and the 'police may not question a suspect in the absence of an attorney[.]'" People v. Jones, 2 N.Y.3d 235, 240 (2004) (quotation omitted). "[O]nce a defendant in custody on a particular matter is represented by or requests counsel, custodial interrogation about any subject, whether related or unrelated to the charge upon which representation is sought or obtained, must cease[.]" People v. Steward, 88 N.Y.2d 496, 501 (1996).

direct appeal, namely, that the trial court had erroneously failed to suppress Tompkins' statements to police because his right to counsel had attached with regard to the drug charge, and he could not validly waive his right to counsel with regard to the murder and home invasion charges. Appellate counsel asserted that the issue had been preserved by trial counsel in his motion to suppress.

Contrary to his argument here (that trial counsel did assert the issue), Respondent argued on direct appeal that the right-to-counsel claim had not been preserved. See People's Appellate Brief at 9-10 ("[T]he issue of the alleged violation of the defendant's right to counsel was not raised below-not in his motion papers, not at the hearing on the motion to suppress, and not in the suppression court's decision and order.") (citations to record omitted), Respondent's Appendix ("Resp't App.") C. Although Respondent is accusing Petitioner of "wanting to have it both ways", the same claim may be leveled at Respondent.

As an initial matter, the Court notes that Respondent's lack-of-preservation argument is incorrect as a matter of state law: "[A] claimed deprivation of the State constitutional right to counsel may be raised on appeal, notwithstanding that the issue was not preserved by having been specifically raised in a suppression motion or at trial[.]" People v. Kinchen, 60 N.Y.2d 772, 773 (1983) (citation omitted). In accordance with this rule, the Appellate

Division considered Tompkins' contention that his state right to counsel had been violated because the police interrogated him notwithstanding his representation on an unrelated drug charge. The Appellate Division held that the trial court "properly refused to suppress [his] statements to the police despite his representation by counsel in an unrelated criminal proceeding, 'inasmuch as there is no evidence in the record that the interrogating police officers had any knowledge . . . of defendant's representation by counsel therein'[.]" <u>People v. Tompkins</u>, 66 A.D.3d 1373, 885 N.Y.S.2d at 668 (quoting <u>People v. Johnson</u>, 61 N.Y.2d 932, 934 (1984); other citations omitted).[6] Assuming that trial counsel failed to assert the denial-of-counsel argument at the suppression hearing, the omission did not prejudice Petitioner since the Appellate Division considered the issue on the merits on appeal.

### b.   Failure to Challenge the Voluntariness of Petitioner's Statements

Tompkins contends that trial counsel "never mentioned the [in]voluntariness" of his statements to the police. Again, this claim is belied by the record. In his motion to suppress, trial counsel challenged the voluntariness of Tompkins' confessions. The

---

[6]

Either actual or constructive knowledge by interrogating police officers that a defendant is represented by counsel suffices to perpetuate the indelible state right to counsel once attached. <u>People v. Lopez</u>, 16 N.Y.3d 375, 382-83 (2011) (holding that police officer who questioned defendant in custody about an unrelated matter was required to make a reasonable inquiry concerning the defendant's representational status before commencing interrogation, where the circumstances, such as fact that bail had been set, indicated that there was a probable likelihood that an attorney had entered the custodial matter, and the accused was actually represented on the custodial charge).

suppression court held that Tompkins was properly advised of his Miranda rights and made a knowing, voluntary, and intelligent waiver of those rights. See Monroe County Court Order dated July 9, 2003, at 3-4, Resp't App. C. On direct appeal, the Appellate Division held that the "record establishe[d] that [Tompkins] knowingly and intelligently waived his Miranda rights, and there is no indication that he was threatened or coerced or that the police unlawfully isolated him from supportive adults who attempted to see him[.]" People v. Tompkins, 66 A.D.3d 1373, 885 N.Y.S.2d at 668 (citations omitted).

### c.    Failure to Move for Severance

Tompkins argues, as he did on direct appeal, that trial counsel was ineffective in failing to move for severance so as to afford Tompkins separate trials on the murder charges and the charges stemming from the home invasion. Respondent argues that such a motion would have had no chance of success and trial counsel's decision thus was not professionally unreasonable.

As Respondent points out, New York Criminal Procedure Law ("C.P.L.") § 200.20(2)(b) permits joinder of offenses encompassing different criminal transactions when the offenses, or the underlying criminal transaction, are of such a nature that proof of one offense or transaction would be material and admissible as evidence in the prosecution's case-in-chief during a trial of the other offense or transaction. N.Y. CRIM. PROC. LAW § 200.20(2)(b). In

such case, "the trial court has no discretion" to sever counts pursuant to C.P.L. § 200.20(3). People v. Kelley, 46 A.D.3d 1329, 1332 (4th Dept. 2007) (citing, inter alia, People v. Bongarzone, 69 N.Y.2d 892, 895 (1987)).

Here, the offenses were properly joined pursuant to C.P.L. § 200.20(2)(b). As Respondent argues, proof that Tompkins used a gun during the Sanders Street home invasion—which ballistics test results revealed was the weapon used in the Portland Avenue slaying—constituted relevant and material evidence as to the Portland Avenue shooter's identity. Since the offenses were properly joined under C.P.L. § 200.20(2)(b), the trial court "lacked statutory authority to grant defendant's [severance] motion[.]" People v. Murphy, 28 A.D.3d 1096, 1097 (4th Dept. 2006) (trial court lacked authority to grant severance motion where the offenses were inextricably interwoven and the evidence of each offense helped establish the identity of the perpetrator of the other offenses) (quotation and citations omitted); see generally Bongarzone, 69 N.Y.2d at 895.

Defense counsel cannot be found ineffective for failing to make a motion that had no likelihood of success, and Petitioner cannot have been prejudiced by the failure to make an unmeritorious motion. See, e.g., United States v. De La Pava, 268 F.3d 157, 163 (2d Cir. 2001) (defendant failed to establish either prong of Strickland in connection with his claim that counsel was

ineffective in failing to make a motion to dismiss the indictment that lacked merit).

### d.    Failure to a Make Record of Jury Selection

Tompkins contends that trial counsel was ineffective because he allegedly failed to insure that an appellate record was made of the jury selection proceedings. As Respondent points out, 149 pages of the trial transcript record the jury selection. The crux of Petitioner's complaint thus appears to be that the transcript does not record the attorneys' actual statements about which jurors were excused and which were seated. See Defendant's Appellate Brief at 31 ("Three sweeps were made for jury selection, but none of this selection was recorded. This is unacceptable practice, as on appeal one must demonstrate prejudice by absence of the record, usually an impossibility.") (citing People v. Harrison, 85 N.Y.2d 794, 796 (1995); citation to transcript omitted). Appellate counsel's assertion is confusing, to say the least. Moreover, the Harrison case is inapposite.

Harrison stands for the proposition that the complete absence of a stenographic record as required by N.Y Judiciary Law § 295 to facilitate a defendant's fundamental right to appeal a criminal conviction does not, per se, require reversal of a defendant's conviction; instead, prejudice must be shown. In Harrison, unlike Tompkins' case, the trial court had refused to order the stenographer to record portions of the jury voir dire despite

-14-

defense counsel's repeated requests that a record be made of her objections to several statements of the prosecutor and the judge. Id. Because the dispute regarding the substance of the comments by the trial court and counsel established that an accurate account could not be reconstructed even if remittal was ordered for that purpose, a reconstruction hearing could not cure the prejudice to the defendant. Accordingly, reversal was required.

Here, there is no suggestion that any untoward remarks were made by the prosecutor or the trial court, as was the case in Harrison. In any event, the information which was not recorded (the attorneys' statements as to which jurors were excused and which remained) was discernable from the transcript as a whole.

### e.   Failure to Make an Opening Statement

Petitioner contends that trial counsel was ineffective in failing to give an opening statement, stating that there is "no acceptable reason" for defense counsel to forego the "opportunity to at minimum educate the jury about what it means to put the [P]eople to their burden of proof . . . ." Defendant's Appellate Brief at 32.

"[T]he decision whether to make an opening statement and when to make it is ordinarily a matter of trial tactics and strategy which will not constitute the incompetence basis for a claim of ineffective assistance of counsel." United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir. 1987) (holding that counsel decision to

waive argument was "certainly reasonable under the circumstances" since it meant that he "did not commit [him]self to a particular position and was thus free to develop any defense that might materialize as the prosecution presented its case") (citations omitted). Moreover, the subject matter that Tompkins' trial counsel supposedly should have included in his opening statement–how to apply the "reasonable doubt" standard–was improper legal argument and beyond the proper scope of an opening statement. See, e.g., United States v. Wables, 731 F.2d 440, 449 (7th Cir. 1984) ("It is beyond question that 'it [is] for the judge, not counsel, to explain the law to the jury.'") (quotation omitted); United States v. Dinitz, 424 U.S. 600, 612 (1976) (Burger, C.J., concurring) ("An opening statement has a narrow purpose and scope. It is to state what evidence will be presented, to make it easier for the jurors to understand what is to follow, and relate parts of the evidence and testimony to the whole; it is not an occasion for argument.") (emphasis supplied).

Had Tompkins' defense counsel presented the type of opening statement urged by appellate counsel, the trial court likely would have sustained an objection by the prosecutor. See People v. Frazier, 291 A.D.2d 211, 212, 738 N.Y.S.2d 16, 18 (1st Dept.) ("The court was entitled to control the content of a defense opening that went beyond a brief outline of what it believed would be supported

by the evidence."), appeal denied, 98 N.Y.2d 675 (2002); see generally United States v. Wables, 731 F.2d at 449.

### f.   Failure to Cross-Examine Witnesses

Petitioner claims that trial counsel was ineffective because he failed to cross-examine key witnesses, in particular, the firearms expert. According to Petitioner's appellate counsel, the failure to cross-examine this witness "demonstrated to the jury that his first word was not to be questioned, . . . which is not a strategy." Defendant's Appellate Brief at 32.

"Decisions about 'whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature' and generally will not support an ineffective assistance claim." Dunham v. Travis, 313 F.3d 724, 732 (2d Cir. 2002) (quoting Nersesian, 824 F.2d at 1321). Here, Petitioner has offered no indication as to what concessions defense counsel should have been able to elicit from the ballistics expert on cross-examination or how counsel could have discredited that witness. Petitioner cannot demonstrate prejudice based on pure speculation.

### g.   Failure to Object

Petitioner claims, as he did on direct appeal, that trial counsel "failed to object to the admission of statements by the defendant, including a photocopy, and never mentioned voluntariness." These assertions are contradicted by the record. When, at the suppression hearing, the prosecution sought to

introduce a photocopy of Petitioner's statements to the police, defense counsel objected on the basis that a photocopy was not the best evidence available. Trial counsel objected again at trial, asserting that there was no proper foundation for the photocopy of the statement and that it was not the best evidence. T.187. The trial court agreed that the prosecutor needed to lay a proper foundation, and the prosecutor proceeded to elicit testimony from the police officer that the copy fairly and accurately depicted the original. T.188.

With regard to Petitioner's assertion that trial counsel "never mentioned voluntariness," any omission by trial counsel did not prejudice Petitioner because the Appellate Division considered the issue of voluntariness on appeal and held that his statements to police were given voluntarily and were not the product of coercion or improper tactics.

### h.   Failure to Investigate

Petitioner asserts, as he did on direct appeal, that trial counsel failed to "conduct an independent investigation which would've led to exculpatory evidence" and "failed to look into/produce an eye witness who identified someone else as the shooter." In support of this claim, Petitioner's appellate counsel submitted copies of police reports (which apparently were not part

of the record stipulated to by the prosecution), see RA.0015-0018,[7] Resp't App. C. These police reports summarized two interviews with MaShona Attenberry ("Attenberry"), Richard Cooper's girlfriend. The eyewitness to whom Tompkins here refers presumably is Attenberry. Some background is necessary to understanding this claim.

### 1.)  Attenberry and the Spinks Brothers

In her statement to the police given on August 27, 2002, immediately after the shooting, Attenberry did not identify the shooter by name and described him as a "dark skinned male black wearing . . . a dark baseball cap and something pulled up over his face." RA.0017. Several months later, when Investigator Dominic showed her a photo array on October 4, 2002, which only showed the eye-areas of the subjects, Attenberry selected photo number five as the person who had shot Cooper. She was told that this individual was Michael Spinks, the brother of Worda Spinks, her ex-boyfriend and the father of her young daughter.

Attenberry explained to Investigator Dominic that Worda Spinks had gotten into a fight with Cooper on the day of the murder.[8] When

---

[7]

Citations to "RA.___" refer to Bates-stamped documents submitted as part of the record on appeal, a copy of which is included as Appendix C in Respondent's Appendix of Exhibits.

[8]

Reading Attenberry's statements in tandem with Tompkins' statements to police, the logical inference is that PT's cousin (whom Tompkins did not identify) was Worda Spinks. As noted above, the motive behind Cooper's murder was revenge: PT explained to Tompkins that his cousin wanted Cooper killed because Cooper had beaten him up.

Attenberry learned from Investigator Dominic that she had selected Michael Spinks' photo, Attenberry stated that she "believed all along that the shooter was Michael Spinks." RA.0015.

At around the time Attenberry was shown a photo array in October 2002, Worda Spinks, viewed two computer-generated photo arrays at the police station on October 15, 2002. Tompkins' photo was not in the first array of about 100 photos, but it was in the second. H.33-34. The suppression hearing testimony was that Worda Spinks "hemmed and hawed" when he got to Tompkins' photo but "never committed" to an identification. H.40. Investigator Dominic did not tell Worda Spinks who the suspect was or who was depicted in the photo at which he hesitated. Worda Spinks later showed the police a photo of Tompkins and stated that this was the person who had shot Cooper. H.26-28;[9] RA.0061.

Michael Spinks also allegedly made an identification of Tompkins when shown a photo array by Investigator Reinstein on November 1, 2002. However, Investigator Reinstein failed to appear at the suppression hearing, and the prosecution offered no evidence concerning that identification. H.46-47. Defense counsel moved to have the identification by Michael Spinks dismissed on the basis of Reinstein's non-appearance. H.47. The prosecutor conceded that he

---

[9]

Citations to "H.___" refer to pages of the transcript of the suppression hearing held on July 7, 2003.

had no basis to oppose the motion, H.48, and the trial court granted the defense application. R.0062.

Contemporaneously with their investigation into Tompkins, the police were investigating Michael Spinks as the shooter. See County Court Order dated July 9, 2003, at 2-3, R.0061-62. When the case against Michael Spinks was presented to the grand jury on March 20, 2003, the matter was "no billed" and an indictment for murder was handed up against Tompkins instead. See Affirmation of Assistant District Attorney Clifford Owens, Esq., ¶3, RA.0066. A Monroe County Court judge subsequently ordered the Michael Spinks case unsealed so that Tompkins' defense counsel could have access to the records generated during that investigation. RA.0064-0065.

Attenberry did not testify at Tompkins' trial. Defense counsel urged the jury to draw an adverse inference against the prosecution based upon this, noting that Cappadonia had mentioned that there was a woman with Cooper at the bus stop. Trial counsel noted that the jury "didn't see her today, yesterday, during the trial." T.334-35.

## 2.)  Trial Counsel's Performance

Petitioner contends that trial counsel was ineffective in failing to investigate Attenberry as an exculpatory witness based upon her identification of Michael Spinks when interviewed by Investigator Dominic in October of 2002. Defense counsel has a constitutional "duty to make reasonable investigations or to make

a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. A defense attorney's decision "whether to call specific witnesses-even those who might offer exculpatory evidence-is not ordinarily viewed as a lapse in professional judgment." United States v. Schmidt, 105 F.3d 82, 90 (2d Cir.), cert. denied, 522 U.S. 846 (1997) (citing United States v. Romero, 54 F.3d 56, 60 (2d Cir. 1995) (trial counsel's decision not to interview two purported eyewitnesses to murder, who had told police that someone other than defendant had killed victim, was reasonable under the circumstances of case), cert. denied, 517 U.S. 1149 (1996); other citation omitted). In order to show that he was prejudiced by counsel's failure to call a particular witness, the petitioner "must show not only that the testimony would have been favorable, but also that the witness would have testified at trial." Croney v. Scully, No. CV-86-4335, 1988 WL 69766, at *2 (E.D.N.Y. June 13, 1988) (citing Alexander v. McCotter, 775 F.2d 595, 602 (5th Cir. 1985)), aff'd mem., 880 F.2d 1318 (2d Cir. 1989).

Tompkins has not established that defense counsel entirely failed to interview Attenberry prior to trial; an equally likely proposition is that defense counsel investigated Attenberry and, as a matter of strategy, decided not to call her. Furthermore, Tompkins has not established that Attenberry in fact would have would have testified favorably for the defense at trial. Thus, he

cannot show that he was prejudiced by defense counsel's failure to call her to testify.

Even assuming that Attenberry would have testified and named Michael Spinks as the shooter, the accuracy of her photo-array identification was open to serious attack: She admitted to the police that the shooter had something covering his face, and the identification she made of Michael Spinks was based only on comparing the eye-areas of the subjects' faces. The jury would necessarily have weighed this shaky identification against Tompkins' detailed and voluntarily given confession and the ballistics evidence establishing that the weapon used to kill Cooper was the same weapon used in the Sanders Street home invasion. Whatever the impact of Attenberry's testimony, it would not have resulted in a reasonable probability of the jury reaching a different result.

After reviewing counsel's alleged errors, the Court finds that some of them were unsupported by the record and others were not errors at all, as discussed above. Most important, Petitioner has not demonstrated prejudice flowing from any of the alleged errors, either when considered individually or cumulatively. Thus, Petitioner cannot fulfill Strickland's two-pronged standard. It necessarily follows that the Appellate Division did not apply Strickland in an objectively unreasonable manner.

**VI.  Conclusion**

For the reasons discussed above, the petition (Dkt. #1) filed by Aaron Tompkins is dismissed with prejudice. Because Petitioner has failed to make a substantial showing of a denial of a constitutional right, the Court declines to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(2).

**SO ORDERED.**

S/Michael A. Telesca

_____
                        MICHAEL A. TELESCA
                        United States District Judge

DATED:      March 11, 2012
            Rochester, New York